# THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JENNIFER L. RYAN | § | |
| | § | Case: 1:26–cv–01069 |
| Plaintiff, | § | Assigned To : Cooper, Christopher R. |
| | § | Assign. Date : 3/25/2026 |
| v. | § | Case No. Description: Pro Se Gen. Civ. (F–DECK) |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**
**(Fabrication of Evidence and Abuse of Process in Sentencing)**

Plaintiff Jennifer L. Ryan, also known publicly as Jenna Ryan, appearing *pro se*, brings this action against Defendant United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. Plaintiff is a citizen of the United States residing in the State of Texas. This action arises from conduct by Assistant United States Attorney Karen E. Rochlin in connection with Plaintiff's sentencing in *United States v. Ryan,* No. 1:21-cr-00050-CRC (D.D.C.), and seeks compensatory damages resulting from that conduct.

## I. NATURE OF ACTION

1. This action seeks compensatory damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, for the Government's fabrication and use of nonexistent evidence during the sentencing phase of *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.).
2. This action does not collaterally attack the validity of Plaintiff's underlying conviction or the court's authority to impose sentence. Instead, it challenges the Government's

RECEIVED
MAR 25 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

independent tortious conduct of knowingly or recklessly attributing to Plaintiff a specific Gmail communication **(the "Scott Free Gmail")** that does not exist in any investigative or evidentiary record and then using that fabricated evidence as an aggravating factor to procure a sixty-day term of incarceration.

3. At its core, this action arises from the Government's fabrication and attribution to Plaintiff of a nonexistent private Gmail message dated January 12, 2021 — three days before her arrest — in which she supposedly stated she would "get off Scott free" at her criminal trial. No such communication has ever existed in any Google Takeout export, forensic extraction, device data, investigative report, or other record associated with the case. The Government has never produced the alleged message, any metadata, any screenshot, or any supporting document, despite repeated challenges. Nevertheless, the Government expressly characterized this fabricated message as Plaintiff's "post-arrest conduct" demonstrating a "sense of impunity" and relied on it as a central aggravating factor to argue for specific deterrence under 18 U.S.C. § 3553(a) and to obtain a sixty-day custodial sentence.

4. Approximately thirty days before sentencing, Assistant United States Attorney Karen E. Rochlin assumed responsibility for the case and conducted a post hoc reconstruction of Plaintiff's seized digital records. In the sentencing memorandum she filed, the Government relied on this nonexistent "Scott Free Gmail" — together with materially distorted timing of Plaintiff's statements and the omission of exculpatory Capitol CCTV footage showing police facilitation of entry — to portray Plaintiff as acting with violent intent and a sense of impunity.

5. Absent the fabricated Gmail communication and the accompanying unsupported assertions, the record before the Court consisted solely of a single non-violent Class B misdemeanor involving approximately ninety seconds inside the Capitol, with no evidence of force, assault, threats, property damage, or interference with law enforcement, and the United States Probation Office's recommendation of twenty-four months' probation. No prior prosecutor had sought incarceration. *(See Ex. F, Sentencing Tr. 5).*

6. The sentencing memorandum containing this fabricated evidence remains part of the permanent public judicial record on PACER and continues to cause ongoing reputational, professional, and emotional harm to Plaintiff.

7. Plaintiff brings this action against the United States for (1) abuse of process, (2) false imprisonment, (3) malicious prosecution, and (4) intentional infliction of emotional distress, as those torts are recognized under District of Columbia law and incorporated through the Federal Tort Claims Act. These claims arise from the Government's fabrication and use of nonexistent evidence during sentencing — conduct that constitutes an investigative function (the post hoc reconstruction and attribution of digital records) rather than legitimate prosecutorial advocacy — and directly resulted in Plaintiff's loss of liberty.

8. The claim for malicious prosecution is based on the Government's continuation and escalation of the deprivation of liberty during the sentencing phase through the knowing or reckless use of fabricated and unsupported evidence to obtain a custodial sentence that the actual evidentiary record did not support.

9. To the extent a favorable termination is required, Plaintiff's full and unconditional Presidential Pardon on January 20, 2025 satisfies that requirement. Under *Thompson v. Clark*, 596 U.S. 36 (2022), favorable termination requires only that the criminal proceeding end without a conviction; it does not require an affirmative declaration of innocence. The pardon terminated the criminal proceeding and removed any ongoing penal consequences of the conviction. See also *McDonough v. Smith*, 139 S. Ct. 2149 (2019).

10. In any event, Plaintiff's claims do not depend on favorable termination of the underlying charge. They arise from the Government's independent use of fabricated and nonexistent evidence during the sentencing phase to procure a custodial sentence. The complete absence of any evidentiary basis for those assertions independently establishes that the resulting deprivation of liberty lacked lawful justification.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1).

12. The Federal Tort Claims Act waives the sovereign immunity of the United States for certain torts committed by federal employees acting within the scope of their employment, under circumstances where a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

13. This action includes claims for false imprisonment, malicious prosecution, and abuse of process. These intentional torts fall within the waiver provided by the law enforcement proviso of 28 U.S.C. § 2680(h) because they arise from the acts or omissions of an investigative or law enforcement officer acting within the scope of employment. See *Millbrook v. United States*, 569 U.S. 50 (2013).

14. The conduct at issue stems from Assistant United States Attorney Karen E. Rochlin's post hoc analysis and reconstruction of investigative evidence derived from Plaintiff's seized digital records, including the knowing or reckless attribution of a Gmail communication that does not exist in any evidentiary record.

15. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1402(b) because the acts or omissions giving rise to the claims occurred in this district and the underlying criminal proceedings were conducted in this district.

16. Plaintiff asserts these claims as common-law torts under District of Columbia law — abuse of process, false imprisonment, malicious prosecution, and intentional infliction of emotional distress — as incorporated through the FTCA.

17. Plaintiff does not assert any independent cause of action arising directly under the Constitution of the United States. To the extent the conduct described herein implicates constitutional principles, those principles serve only as context and evidence of the tortious character of the conduct alleged, not as standalone bases for liability. See *FDIC v. Meyer*, 510 U.S. 471 (1994).

18. Although the law enforcement proviso in § 2680(h) applies to the intentional torts asserted here, Plaintiff does not rely on that proviso to overcome the discretionary function exception in § 2680(a). As set forth in Section VIII.A below, the discretionary function exception is inapplicable because federal officials have no discretion to fabricate evidence, misrepresent the timing of events, or knowingly attribute a nonexistent communication to a defendant in a judicial proceeding.

## III. ADMINISTRATIVE EXHAUSTION

19. Plaintiff timely presented an administrative tort claim to the United States Department of Justice pursuant to 28 U.S.C. § 2675(a). The administrative claim described the Government's tortious misconduct in the sentencing phase of *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.), including the knowing or reckless use of false and unsupported factual assertions that caused Plaintiff's wrongful incarceration, and demanded a sum certain in damages. The damages sought in this Complaint do not exceed that amount.

20. The Department of Justice either denied the claim or failed to make a final disposition within six months after it was filed. Plaintiff has therefore fully exhausted all administrative remedies required under the Federal Tort Claims Act. A copy of the administrative claim, proof of receipt, and related correspondence is attached. *(Ex. J)*.

## IV. STATUTE OF LIMITATIONS

21. Plaintiff's claims are timely under the Federal Tort Claims Act, 28 U.S.C. § 2401(b). Under *McDonough v. Smith*, 139 S. Ct. 2149 (2019), claims based on the use of fabricated evidence in a criminal proceeding do not accrue until the underlying criminal proceedings have terminated. This accrual rule applies to claims arising from the use of fabricated or nonexistent evidence during sentencing to procure a deprivation of liberty.

22. Plaintiff's criminal proceedings in *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.), concluded on January 20, 2025, when she received a full and unconditional Presidential Pardon. This action—filed within two years of that date—is therefore timely under 28 U.S.C. § 2401(b).

23. To the extent favorable termination is required for any particular claim, including malicious prosecution, the January 20, 2025 pardon satisfies that requirement under

*Thompson v. Clark*, 596 U.S. 36 (2022). However, Plaintiff's remaining claims—including false imprisonment, abuse of process, and intentional infliction of emotional distress—arise from the Government's independent use of fabricated and nonexistent evidence during sentencing and do not depend on favorable termination of the underlying charge.

24. Plaintiff did not discover, and could not reasonably have discovered, that the Government had attributed to her a specific Gmail communication (the "Scott Free Gmail") that does not exist in any investigative, forensic, or evidentiary record until approximately September 2025, during her post-pardon review of the record. Prior to that time, no such communication had been produced, identified, or substantiated in any proceeding, and no source document, metadata, or underlying record was ever disclosed.

## V. PARTIES

25. Plaintiff Jennifer Leigh Ryan is a citizen of the United States residing in Texas and was the defendant in *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.), the criminal proceeding giving rise to this action.

26. Defendant United States of America is the proper defendant under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

27. At all relevant times, Assistant United States Attorney Karen E. Rochlin was an employee of the United States acting within the scope of her employment. Rochlin personally reviewed Plaintiff's seized digital records and attributed to Plaintiff a Gmail communication that does not exist in any investigative or forensic record. The tortious conduct alleged in this Complaint arose directly from that activity.

## VI. RELATED PROCEEDINGS

28. Plaintiff has filed a petition for a writ of error coram nobis in *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.), raising the same core allegations as this Complaint, including the Government's attribution of a nonexistent "Scott Free" Gmail communication to Plaintiff. The Court ordered a response. On January 30, 2026, after multiple extensions, the United States filed an opposition that relied primarily on procedural arguments and defended the sentencing memorandum. The Government did not produce the alleged Gmail message, identify any source document, provide any forensic or evidentiary support for its existence, or directly address Plaintiff's showing that no such communication exists in any associated digital record. The petition remains pending.
29. In a separate action filed against AUSA Karen E. Rochlin in her individual capacity in the Northern District of Texas, Plaintiff asserted claims based on the same underlying conduct. The court dismissed that action on jurisdictional grounds without reaching the merits of Plaintiff's factual allegations. See *Ryan v. Rochlin*, No. 3:25-cv-00325-X-BT (N.D. Tex.), ECF No. 26. Neither Rochlin nor the United States has substantively rebutted the core factual allegations regarding the attribution of the nonexistent "Scott Free Gmail" or the reconstructed sentencing narrative.
30. Notably, the United States itself has characterized Plaintiff's allegations as involving malicious prosecution and fabrication of evidence during the sentencing phase. See DOJ Mot. to Dismiss, No. 3:25-cv-00325-X-BT, ECF No. 27 at 13–22.

## VII. STATEMENT OF FACTS

31. This action arises from the Government's use of fabricated and materially unsupported evidence in the sentencing memorandum filed in *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.). Plaintiff pleaded guilty to a single non-violent Class B misdemeanor based on her approximately ninety-second presence inside the Capitol. The United States Probation Office recommended twenty-four months of probation, and the originally assigned prosecutor did not seek any term of incarceration.

32. Approximately thirty days before sentencing, Assistant United States Attorney Karen E. Rochlin assumed responsibility for the case. Shortly after assuming responsibility for the case, and before conducting any meaningful review of the evidentiary record, Rochlin contacted defense counsel, called Plaintiff "a liar," and stated that she would seek a sixty-day custodial sentence. She then undertook a post hoc reconstruction of Plaintiff's seized digital records and filed a sentencing memorandum that introduced a factual representation not present in any investigative file, discovery, or the Presentence Investigation Report: the attribution to Plaintiff of a nonexistent Gmail communication.

33. The sentencing memorandum relied on this fabricated Gmail message, along with selectively presented and temporally distorted statements, to portray Plaintiff as acting with violent intent and a sense of impunity. None of the underlying source materials for these assertions were attached to the memorandum or introduced at the sentencing hearing. *(Ex. E)*

34. The following paragraphs detail the specific fabricated and unsupported assertions, beginning with the nonexistent "Scott Free Gmail" communication that forms the core of this action.

## VII.A. The "Scott Free Gmail" Communication Attributed to Plaintiff

35. The Government's sentencing memorandum expressly attributed to Plaintiff a nonexistent Gmail communication in which she supposedly stated she would "get off Scott free." *(Ex. A)*. Specifically, the memorandum states:

> "On January 12, 2021 at 11:30 p.m., the defendant wrote in a personal message from a gmail account: 'Oh well I can always say I've done it all. I've done everything including having a criminal trial and getting off Scott free because I will get off anything to [sic] try to pin on me.'" *(Ex. E, Sentencing Memorandum at 13 n.10).*

36. The memorandum attributes this message to January 12, 2021 — three days before Plaintiff's arrest on January 15, 2021. The quoted text itself refers to "having a criminal trial," although no charges or criminal case existed at that time. *(Ex. A)*

37. The Government nevertheless characterized this nonexistent message as Plaintiff's "post-arrest conduct" demonstrating a "sense of impunity" and relied on it as a central aggravating factor to argue for specific deterrence under 18 U.S.C. § 3553(a):

> "The defendant's **post-arrest conduct i**ncludes public statements made months after her arrest reflecting a belief that she is immune from punishment because of her appearance and social status, and a personal message that she will get off 'Scott free.' The sense of impunity in these statements demonstrates a need for specific deterrence in this defendant's case…" *(Ex. E, Sentencing Memo at 5).*

38. The alleged Gmail message was not attached to the sentencing memorandum, nor was any supporting document, metadata, or forensic report provided to the Court or defense counsel.

39. No such communication exists in any forensic extraction, Google Takeout export, device data, investigative report, or other documentary record associated with Plaintiff. A comprehensive Google Takeout export confirms there is no record of the alleged message or any communication corresponding to the cited date and time. *(Ex. B)*.

40. Despite being directly challenged, the Government has never produced the alleged Gmail message, any metadata, any screenshot, or any source document — including in its opposition to Plaintiff's pending coram nobis petition. *(Ex. G)*.

41. The Government has not identified any underlying communication that was summarized or interpreted to support the attributed to the "scott free" statement.

42. No copy of the alleged message has ever been produced.

## VII.A(1) Inconsistencies in the Government's Use of the Alleged Communication

43. The alleged Gmail communication contains multiple irreconcilable inconsistencies — temporal, chronological, textual, and evidentiary — each demonstrating that the Government's representation cannot be true of any authentic message.

44. The Sentencing Memorandum presented the statement as a verbatim, time-stamped Gmail message authored by Plaintiff. No such communication exists in any record. *(Ex. E at 13 n.10)*.

45. The memorandum attributes the message to January 12, 2021, yet simultaneously characterizes it as "post-arrest conduct" reflecting a later-formed belief in impunity. The quoted text itself refers to "having a criminal trial" at a time when no criminal case or trial existed. These assertions cannot all be accurate with respect to a single authentic communication.

46. The Sentencing Memorandum attributed the alleged message to Plaintiff without a single piece of forensic evidence confirming its existence or origin: no full email headers (including "Received" lines and IP addresses), no DKIM signature, no Message-ID, no SPF/DMARC authentication results, no identified sender or recipient addresses, no login timestamps, no device identifiers, and no corroborating subsequent communications. *(Ex.*

*E at 13 n.10)*. These are basic indicia of authenticity that would have been present and readily producible had the communication existed in Plaintiff's Gmail account. The complete absence of any such evidence— in a filing that used the purported message as a central aggravating factor to obtain a sixty-day term of incarceration—further establishes that no such message was ever recovered, verified, or produced.

47. Plaintiff's comprehensive Google Takeout export, conducted on March 23, 2026, contains no record of any communication matching the quoted text, timestamp, or substance. *(Ex. B)*.

48. This is not a dispute over interpretation, context, or reasonable inference. It is the affirmative attribution of a specific digital communication that has never been produced and does not exist in any underlying record. The Government nevertheless presented the fabricated message as authentic evidence and relied upon it to support a custodial sentence under 18 U.S.C. § 3553(a).

## VII.B. "Prelude to War" Statement

49. The Sentencing Memorandum cited a statement from Plaintiff's livestream at approximately 7:00 a.m. on January 6, 2021 as evidence that she anticipated violence:

> "First, the defendant was aware that January 6 could be and did become violent. Hours before any mob formed at the Capitol, the defendant broadcast repeated statements that the day was a 'prelude' to 'war.'"
> *(Ex. E, Sentencing Memorandum at 2).*

50. The cited statement occurred approximately eight hours before Plaintiff entered the Capitol at approximately 3:21 p.m. The memorandum quoted only a brief excerpt and did not submit the full recording or the underlying video as an exhibit.

51. The statement was made during a broader discussion of the 2020 election and did not reference the Capitol, any plan to enter it, any call to violence, or any intent to breach the building. The Government identified no additional statement or evidence showing that Plaintiff had advance knowledge, at that time, of any breach of the Capitol or the events that later occurred that day.

52. The Presentence Investigation Report does not identify the statement as evidence of anticipated violence and does not connect it to Plaintiff's entry into the Capitol.

53. The Government nevertheless relied on this temporally remote excerpt to support a finding of violent intent under 18 U.S.C. § 3553(a), without providing the full recording or any corroborating evidence linking the statement to Plaintiff's brief, non-violent presence inside the Capitol, which lasted approximately ninety seconds.

54. The memorandum does not identify any evidentiary basis for connecting the morning statement to Plaintiff's later entry into the Capitol.

## VII.C. "Breaking Windows" Recording

55. Within the timeline constructed in the Sentencing Memorandum, the Government attributed to Plaintiff a statement about "breaking windows" and presented it as occurring as she approached or arrived at the Capitol:

> "Second, as she arrived at the Capitol, the defendant continued to promote violence… 'we're all gonna be… breakin' those windows…'" *(Ex. E at 2)*

56. The Government relied on this statement to argue that Plaintiff anticipated and promoted violence **before** entering the Capitol.

57. However, the Government's own citation places the referenced recording at approximately 4:22 p.m. *(Ex. E at 12 n.8)* — more than one hour after Plaintiff had

already entered the Capitol at approximately 3:21 p.m. and exited at approximately 3:23 p.m.

58. During the sentencing hearing, AUSA Rochlin again described the statement as occurring "in the aftermath" of events that had already taken place. *(Ex. F, Sentencing Tr. 18:15–16)*. This description is consistent with the memorandum's own timestamp.

59. The Government identified no recording or evidence showing that Plaintiff made any "breaking windows" statement **prior to** her entry into the Capitol.

60. The Presentence Investigation Report does not attribute any such statement to Plaintiff in connection with her entry and does not characterize her as promoting violence upon arrival.

61. Nevertheless, the Government relied on this temporally inconsistent attribution to support a finding of violent intent under 18 U.S.C. § 3553(a), and the Court in turn relied on that characterization in imposing a custodial sentence.

## VII.D. Compression of Events During Plaintiff's Brief Presence in the Capitol

62. The co-defendant sentencing memorandum states that Plaintiff entered the Capitol at approximately 3:21 p.m. and began exiting at approximately 3:23 p.m., remaining inside for roughly ninety seconds. *(Ex. H)*.

63. Within that approximately ninety-second period, however, the Government's sentencing memorandum *(Ex. E, p. 8)* attributed to Plaintiff a wide range of statements and interactions, including:

    - shouting "USA" and "in the name of Jesus" upon entry;
    - asking codefendant Hyland about the location of codefendant Schwab;
    - determining that Schwab had moved further ahead;
    - recording video for Facebook Live;
    - making promotional remarks concerning Plaintiff's real estate business;

- hearing another individual shout about going to the office of the Speaker of the House;
- joining chants of "Fight for Trump;"
- discussing the potential use of tear gas and the lack of protective goggles;
- hearing other individuals speculate about pushing doors further inside the building;
- stating "Okay, let's just stand here;"
- appearing in a third-party recording inside the Rotunda area;
- being affected by chemical irritants that allegedly caused Plaintiff to retreat from the building;
- and beginning to exit the building shortly thereafter.

64. These attributions appear to have been drawn from multiple disparate sources, including Plaintiff's own recordings, statements by others in the crowd, and third-party videos. The sentencing memorandum did not distinguish among those sources, identify the speaker for each statement, or provide any synchronized timeline showing when each interaction actually occurred.

65. Instead, the memorandum grouped these statements together without identifying their sources, speakers, or timing, without citation to supporting materials or exhibits, and without any indication of when each interaction occurred within the approximately ninety-second period.

66. The Presentence Investigation Report does not describe Plaintiff's conduct in this manner and does not attribute to her any sequence of sustained or coordinated activity inside the Capitol.

67. The sentencing memorandum thus reflects a post hoc compilation and reconstruction of disparate materials from multiple sources, assembled and presented as a unified aggravating narrative without identifying the underlying evidentiary source or temporal sequence for each attributed statement. As a result, it does not provide a reliable evidentiary basis for the factual assertions it attributes to Plaintiff.

## VII.E. Exit from the Capitol

68. Video recordings show Plaintiff stating, "I have nothing to do here," and voluntarily leaving the Capitol shortly after entering. *(Ex. F at 33:8–15).*

69. The Sentencing Memorandum nevertheless characterized Plaintiff's exit as the result of exposure to chemical agents. *(Ex. E at 2).*

70. The record contains no video, report, or other evidence establishing that Plaintiff was sprayed with tear gas or otherwise forced to leave the building.

71. At the sentencing hearing, defense counsel specifically referenced the video and explained that Plaintiff exited because she believed she had no reason to remain. Despite this objection and the absence of supporting evidence, the Court adopted the premise that Plaintiff "clearly experienced the tear gas." *(Ex. F at 30–31).*

72. The Presentence Investigation Report does not attribute Plaintiff's exit to chemical agents and does not characterize her departure as compelled.

73. The Government relied on this unsupported characterization, and the Court in turn adopted it, to portray Plaintiff's conduct as involving continued exposure to and participation in a volatile environment — thereby supporting a custodial sentence under 18 U.S.C. § 3553(a).

## VII.F. Suppression of Cooperation and Mitigating Evidence

### VII.F(1) Cooperation with Investigators

74. At sentencing, the Government argued that Plaintiff's cooperation did not "weigh strongly in favor of a reduced sentence." Specifically, AUSA Rochlin represented that

Plaintiff had provided passwords but had not made her devices available, and compared her level of cooperation unfavorably to that of other defendants. *(Ex. F at 21:11–22:11)*.

75. The sentencing memorandum similarly asserted that Plaintiff's "lack of candor with the Court's own officers certainly does not weigh in favor of a more lenient sentence." *(Ex. E at 20)*.

76. In reality, Plaintiff voluntarily surrendered, provided access credentials for all her devices, relinquished her cellular phone, volunteered passwords, entered a guilty plea, participated fully in the Presentence Investigation Report process, offered proffers, and appeared for an interview with the House Select Committee.

77. The sentencing memorandum omitted the full scope and timing of Plaintiff's cooperation and failed to acknowledge her compliance with pretrial supervision.

78. The Presentence Investigation Report did not characterize Plaintiff as uncooperative and expressly reflected her compliance with pretrial supervision.

79. Nevertheless, the Government presented Plaintiff's cooperation as limited and insufficient. It relied on this characterization to argue that cooperation did not weigh against a custodial sentence and, in context, supported the need for incarceration under 18 U.S.C. § 3553(a).

## VII.F(2) CCTV Footage - Police Facilitation of Entry at East Rotunda Door

80. Capitol CCTV footage from the East Rotunda doors shows a uniformed officer gesturing and affirmatively allowing members of the public to enter through the doorway moments before Plaintiff entered at approximately 3:21 p.m. Plaintiff remained inside for approximately ninety seconds, standing near the same officer shown in the footage, before exiting. *(Ex. I)*.

81. This footage was in the Government's possession during the investigation and at the time the sentencing memorandum was prepared. The Presentence Investigation Report does not describe the footage and characterizes Plaintiff's conduct as limited.

82. The Government's sentencing memorandum did not reference, describe, or acknowledge the East Rotunda CCTV footage at all.

83. In subsequent proceedings, the United States has acknowledged that the footage was in its possession during the investigation and sentencing and that its contents were known to the parties and the Court. See United States' Opposition, ECF No. 119 at 8 n.5; DOJ Mot. to Dismiss, No. 3:25-cv-00325-X-BT, ECF No. 27 at 8 n.5. *(Ex. G)*

84. Despite possessing this exculpatory footage and knowing its contents, the Government omitted any reference to it in the sentencing memorandum and did not address its implications for the circumstances of Plaintiff's entry or her relative culpability.

85. The available evidence shows that Rochlin had access to information reflecting the true circumstances of Plaintiff's entry and conduct, yet the sentencing memorandum omits that information while presenting a narrative that is materially incomplete in light of the record.

86. The Government nevertheless relied on a characterization of Plaintiff's entry into the Capitol as knowing and willful in a manner that supported a custodial sentence under 18 U.S.C. § 3553(a), without accounting for material context reflected in the available evidence.

87. By deliberately omitting the CCTV footage depicting police facilitation of entry, Rochlin excluded material mitigating context bearing on Plaintiff's entry and culpability, thereby bolstering the Government's request for incarceration.

## VII.G. Use of Plaintiff's Identity as an Aggravating Sentencing Factor

88. The Government's sentencing memorandum emphasized Plaintiff's public profile as a social media personality, citing her follower counts, online engagement, media appearances, and prior publicity to portray her conduct as more serious than that of other defendants.

89. The memorandum argued that Plaintiff's online presence "amplified the impact" of her statements and placed her actions in a more "disturbing light," asserting that her platform increased the significance of her offense. *(Ex. E)*.

90. At sentencing, the Court likewise referenced Plaintiff's public profile and audience size when explaining the sentence imposed. *(Ex. F at 48–49)*.

91. The Presentence Investigation Report did not identify Plaintiff's professional status, social media following, or public persona as an aggravating factor. Nor did the PSR attribute to Plaintiff any leadership role, coordination, or influence over other participants in the events of January 6.

92. The Government nevertheless relied on Plaintiff's identity and audience size as an aggravating factor under 18 U.S.C. § 3553(a), without presenting any evidence that she directed, organized, or influenced the conduct of others at the Capitol.

93. In doing so, the memorandum branded Plaintiff as dangerous and in need of specific deterrence because of who she was — a known social media personality with a public platform — rather than because of anything she actually did inside the Capitol.

## VII.H. Framework of Rochlin's Sentencing Narrative

## VII.H(1). Structured Escalation

94. The Government's sentencing memorandum did not present a chronological account of events. Instead, it was structured as a deliberate escalation: moving from alleged pre-event intent, to alleged encouragement of violence, to alleged lack of remorse — all in support of a custodial sentence under 18 U.S.C. § 3553(a)(2)(B).

95. The memorandum sequenced selected excerpts — including the morning "prelude to war" statement, the "breaking windows" recording (falsely presented as occurring upon arrival), and the nonexistent "Scott Free" Gmail communication — to create a narrative arc portraying Plaintiff as someone who anticipated, promoted, and remained unrepentant about violence.

96. These materials were drawn from widely different times and sources and were not presented with any consistent temporal or evidentiary framework identifying the source, timing, or context of each attributed statement, or linking those statements to specific supporting materials.

97. This constructed escalation materially diverged from the plea record and the Presentence Investigation Report, which described only a brief, non-violent Class B misdemeanor involving approximately ninety seconds near the entrance and did not characterize Plaintiff as violent, an organizer, or lacking remorse.

98. In advancing this narrative, AUSA Rochlin functioned in part as an unsworn witness, introducing and attesting to specific facts — including the existence, timing, and meaning of communications — that were not contained in the investigative record, discovery materials, or the Presentence Investigation Report. See *Kalina v. Fletcher*, 522 U.S. 118 (1997).

99. By contrast, for a co-defendant in the same case identified the specific source materials for each factual assertion through detailed exhibit lists. *(Ex. H-1, Hyland Sentencing Memo Exhibit List)*. The Government's sentencing memorandum in Plaintiff's case did neither.

100. In this respect, the memorandum operated, in part, as an unsworn factual narrative, attributing and interpreting evidence without identifying the underlying source material or temporal sequence for its assertions.

101. While a prosecutor may argue reasonable inferences from evidence actually in the record, she may not assert or rely upon facts that lack any support in that record. Reliance on such unsupported assertions undermines the reliability of the sentencing determination.

## VII.H(2) Procedural By-Pass of Rule 32

102. Prior to sentencing, AUSA Rochlin emailed the Probation Office seeking to discuss "observations" about Plaintiff's 7:00 a.m. livestream *(Ex. D)*, outside the formal Rule 32 process for disputing or supplementing PSR facts. Fed. R. Crim. P. 32(i)(1)(A)–(B).

103. The email shows that Rochlin was actively analyzing the timing and context of recorded events, as well as the purported violent intent of statements therein, for use in connection with the Presentence Investigation Report.

104. At the sentencing hearing, however, the Government stated on the record that it had no objections to the Presentence Investigation Report. (Ex. F at 4). That Report characterized Plaintiff as among the least culpable January 6 defendants and recommended twenty-four months of probation.

105. No written objections, proposed factual additions, or supplemental materials corresponding to the communications, sequencing, or characterizations later asserted in the sentencing memorandum were ever submitted through the Rule 32 process.

106. By accepting the PSR without objection on the record, yet simultaneously substituting an extra-record narrative based on different factual assertions, the Government bypassed the standard fact-resolution procedures designed to ensure the accuracy and reliability of the sentencing record.

107. The PSR was therefore accepted without modification as the operative factual baseline, while the Government advanced additional assertions — including the existence, timing, and meaning of specific communications — that were never incorporated into the PSR or tested under Rule 32.

108. While the Government may argue reasonable inferences from evidence in the record, it may not attribute facts to a defendant that are not supported by identified and verifiable source material.

## VII.H(3) Use of Vague and Non-Verbatim Representations to Support Conclusions of Intent

109. At the sentencing hearing, the Government itself acknowledged that its timeline was only approximate — stating "As best I can place things on the timeline" *(Ex. F at 15:7–8)* — and that its characterizations were "not word for word" *(Ex. F at 19:13–14)*. Nevertheless, it relied on these reconstructed and paraphrased statements to support definitive conclusions of violent intent and the need for incarceration.

110. The Presentence Investigation Report serves as the primary vehicle for resolving disputed factual matters prior to sentencing under Rule 32 and provides the factual baseline upon which the Court relies unless properly challenged.

111. By relying on approximate reconstructions and paraphrased statements while simultaneously declining to raise any objections to the PSR, the Government created an internal inconsistency demonstrating that the narrative was not grounded in fixed, verifiable record evidence, but was instead constructed from selectively assembled and recharacterized materials.

112. No written objections or factual disputes were submitted to the Probation Office under Rule 32(f), and no request was made for the Court to resolve any disputed facts contained in or omitted from the PSR.

113. The PSR was therefore accepted without modification as the operative factual record, yet the Government advanced additional, non-verbatim factual assertions outside that process and without identification in the PSR.

114. While the Government may argue reasonable inferences from evidence in the record, it may not assert or rely upon factual representations that are not supported by identified and verifiable source material.

## VII.H(4). Sensationalized Framing Likely to Invite Widespread Media Dissemination

115. The sentencing memorandum was drafted in a highly dramatic and attention-grabbing style. It opened with an extended focus on Plaintiff's public persona, social media follower counts, media appearances, and self-described influencer status before even addressing the actual offense conduct.

116. Key assertions — particularly the nonexistent "Scott Free" Gmail message, the temporally rearranged "breaking windows" statement, and the decontextualized "prelude to war" excerpt — were presented with vivid, quotable language clearly designed to invite immediate media extraction and headline treatment.

117. As a direct result, numerous news outlets and broadcasts treated the Government's unsupported assertions—especially the alleged "Scott Free" message—as established fact. By embedding vivid, quotable assertions in an official court filing without supporting exhibits or source material, Rochlin ensured that disputed factual representations would be preserved in the judicial record and disseminated publicly as verified truth. Many of those reports remain publicly accessible years later and continue to appear prominently in searches of Plaintiff's name.

118. By embedding sensational details in a publicly filed court document without attaching any supporting exhibits or source material, the Government ensured that disputed and fabricated factual representations would be permanently preserved in the judicial record while simultaneously being disseminated worldwide as verified truth. This widespread and enduring dissemination has significantly amplified the reputational and professional harm caused by the misrepresentations.

## VII.I. Sentencing Outcome Resulting from the Government's Sentencing Narrative

119. The sentencing court relied on the Government's representations when determining Plaintiff's sentence.

120. In explaining the sentence imposed, the Court expressly cited statements attributed to Plaintiff as evidence of violent intent and lack of remorse, including: "You knew it when you walked out of your hotel room and said we're going to war, and we're going to be breaking windows." *(Ex. F, Sentencing Tr. 43:7–11)*

121. The Court also referenced Plaintiff's alleged sense of impunity and public profile, adopting the Government's characterization of her conduct in concluding that a custodial sentence was necessary for specific deterrence. *(Ex. F at 47–49)*

122. The Court's analysis thus incorporated the Government's narrative sequencing of alleged intent, conduct, and lack of remorse when applying the § 3553(a) factors.

123. The United States Probation Office had recommended twenty-four months of probation. *(Ex. F at 5)*. The PSR was accepted without objection and provided no basis for incarceration.

124. Nevertheless, the Court imposed sixty days of imprisonment based on Rochlin's independent assertions — including the nonexistent "Scott Free" Gmail message and other unsupported characterizations — that were not supported by the evidentiary record or the PSR.

125. Plaintiff served the full sixty-day custodial sentence.

126. The sentence of incarceration directly resulted from the Government's introduction and use of fabricated and additional factual assertions that were presented outside the Rule 32 process and were not contained in the Presentence Investigation Report.

## VIII. WAIVER OF SOVEREIGN IMMUNITY

127. The United States has waived sovereign immunity for the claims asserted in this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. None of the statutory exceptions to that waiver applies to the conduct described herein.

### VIII.A. The Discretionary Function Exception Does Not Apply

128. The discretionary function exception, 28 U.S.C. § 2680(a), does not bar Plaintiff's claims. Under the two-part test of *Berkovitz v. United States*, 486 U.S. 531 (1988), and *United States v. Gaubert*, 499 U.S. 315 (1991), the exception shields only conduct that (1) involves an element of judgment or choice and (2) is grounded in social, economic, or

political policy considerations. It does not protect violations of mandatory legal duties or the Constitution.

129. The conduct at issue involves specific, verifiable factual assertions about the existence, content, timing, and meaning of concrete evidence — assertions that are either true or false. Such representations are not the type of discretionary governmental judgment the exception was designed to protect.

130. Federal officials retain discretion to evaluate existing evidence and draw reasonable inferences from the record. That discretion ends where factual representation begins. They possess no discretion to assert as fact material that does not exist in any record, to fabricate communications, to alter timelines, to omit materially qualifying evidence, or to present incomplete excerpts in a manner that materially changes their meaning. The allegations in this Complaint fall squarely in the latter category.

131. A defendant must be sentenced based on accurate and reliable factual information, not on fabricated or unsupported assertions. The Government has not identified any underlying communication corresponding to the attributed "Scott Free Gmail," and no such communication exists in any investigative or forensic record. While prosecutors may argue reasonable inferences from evidence, they may not attribute unsupported facts to a defendant or rely on nonexistent evidence to support a deprivation of liberty.

132. The United States' own litigation positions in related proceedings reinforce that the conduct at issue is operational and case-specific rather than high-level policy judgment. In both the coram nobis matter and the Bivens action, the Government has characterized AUSA Rochlin's actions as "advocacy" while declining to defend the accuracy or existence of the underlying factual representations on the merits.

133. Specific examples of non-discretionary misconduct include, but are not limited to:

- Asserting the existence of a private Gmail communication dated January 12, 2021, in which Plaintiff supposedly stated she would "get off Scott free," although no such message has ever existed in any Google Takeout export, forensic extraction, device data, or investigative file, and no source document has ever been produced;
- Citing a recording as evidence of violent intent "as she arrived at the Capitol," while the Government's own footnote placed the recording more than one hour after Plaintiff had already exited the building;
- Presenting selective excerpts that materially distort meaning (including omission of qualifying language) while failing to provide the full recordings or context;
- Characterizing Plaintiff's voluntary exit — captured on video with her statement "I have nothing to do here" — as removal by chemical agents;
- Omitting Capitol CCTV footage showing a uniformed officer facilitating entry through the East Rotunda doors; and
- Mischaracterizing or downplaying Plaintiff's documented cooperation with investigators.

134. These acts consisted of specific, objective factual representations about identifiable evidence in a single sentencing proceeding — representations that are capable of objective verification and, as alleged here, demonstrably false. Distortion or fabrication of adjudicative facts used to deprive a citizen of liberty is not a protected discretionary function. *See Berkovitz v. United States*, 486 U.S. at 536–37; *Limone v. United States*, 579

F.3d 79, 89–90 (1st Cir. 2009); *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016).

135. Even after *Martin v. United States*, 145 S. Ct. 1692 (2025) (holding that the law enforcement proviso does not override the discretionary function exception), the exception does not apply here because the conduct at issue was neither discretionary in the protected sense nor grounded in policy judgment. Fabrication and knowing misrepresentation of evidence fall outside the exception in every circuit that has addressed the issue. The dispositive question is therefore not whether discretion existed in the abstract, but whether federal officials have discretion to present false or nonexistent evidence as fact in a judicial proceeding. They do not.

136. The discretionary function exception was never intended to immunize the knowing or reckless introduction of false or unsupported factual material into a judicial sentencing proceeding. Because every act alleged in this Complaint consists of the misrepresentation, manipulation, suppression, or fabrication of specific evidence — rather than protected policy judgment — the exception does not apply.

## VIII.B. The Law Enforcement Proviso Applies

137. The Federal Tort Claims Act expressly waives sovereign immunity for false imprisonment, malicious prosecution, abuse of process, and certain other intentional torts when committed by "investigative or law enforcement officers" of the United States acting within the scope of their employment. 28 U.S.C. § 2680(h). The statute defines such officers functionally — as any officer empowered by law to execute searches, seize evidence, or make arrests — regardless of official title or institutional role.

138. Assistant United States Attorney Karen E. Rochlin satisfies this functional definition. Although prosecutors are not traditionally classified as "law enforcement," the FTCA looks to the nature of the conduct actually performed. *See Millbrook v. United States*, 569 U.S. 50, 57 (2013).

139. In this case, Rochlin personally reviewed and analyzed digital records and communications that had been seized or obtained through compulsory process (including under Fed. R. Crim. P. 41 and 17(c)). She then made specific factual representations in the sentencing memorandum and at the hearing about the existence, content, timing, and meaning of those records — including the attribution of a Gmail communication that does not exist in any forensic extraction or Google Vault export.

140. In modern digital investigations, the detailed review, parsing, and characterization of seized electronic data constitutes the functional equivalent of a continued search or investigative activity. The tortious conduct alleged here arose directly from that investigative review and the subsequent factual attestations about its contents.

141. The Supreme Court has repeatedly held that prosecutors lose absolute immunity — and perform investigative rather than purely advocative functions — when they gather, evaluate, construct, or attest to evidence. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273–74 (1993); *Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997).

142. Rochlin's actions fall squarely within this category. By conducting a post hoc analysis and reconstruction of seized materials long after the original investigation, generating new factual assertions not contained in the Presentence Investigation Report or discovery, and personally representing the existence and meaning of specific communications and recordings, she stepped outside the role of advocate and into the role of investigator and unsworn witness.

143. Because the tortious conduct alleged in this Complaint arose from the investigative review and factual misrepresentation of seized evidence by an officer empowered to obtain and control such evidence, the law enforcement proviso of 28 U.S.C. § 2680(h) applies. *See also Sami v. United States*, 617 F.2d 755 (D.C. Cir. 1979); *Briggs v. Goodwin*, 569 F.2d 10 (D.C. Cir. 1977).

144. While the proviso waives immunity for the intentional torts asserted here, it does not override the separate discretionary function exception in § 2680(a). *See Martin v. United States*, 145 S. Ct. 1692 (2025). Plaintiff does not rely on the proviso to defeat the discretionary function exception; that exception is inapplicable for the independent reasons set forth in Section VIII.A above.

## VIII.C. The Misrepresentation Exception Does Not Apply

145. The misrepresentation exception set forth in 28 U.S.C. § 2680(h) is inapplicable. That exception bars claims only when a plaintiff's injury flows from his or her own reliance on a false statement or misrepresentation made by a government employee. *United States v. Neustadt*, 366 U.S. 696 (1961); *Block v. Neal*, 460 U.S. 289, 296–97 (1983).

146. Plaintiff never relied on any misrepresentation by AUSA Rochlin. Her injuries — loss of liberty for sixty days, reputational harm, and ongoing emotional and professional damage — arose because the sentencing court relied on the Government's materially false and fabricated factual assertions, including the attribution of a nonexistent Gmail communication and multiple contradicted timestamps, when it imposed a custodial sentence.

147. The heart of Plaintiff's claims is the Government's construction and presentation of a false evidentiary narrative that corrupted the sentencing process and directly caused her wrongful imprisonment. These claims sound in abuse of process, false imprisonment, malicious prosecution, and intentional infliction of emotional distress — none of which depends on Plaintiff's reliance on a misstatement. The misrepresentation exception therefore has no application. *See Block v. Neal*, 460 U.S. at 297 (exception does not reach claims grounded in the government's underlying wrongful conduct).

148. The reliance at issue was judicial reliance, not reliance by Plaintiff.

## IX. COUNTS

### COUNT I – ABUSE OF PROCESS

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)

149. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein, including the Statement of Facts in Section VII, the Framework of Rochlin's Sentencing Narrative in Section VII.H, and the Waiver of Sovereign Immunity in Section VIII.

150. Under District of Columbia law, abuse of process occurs when a party willfully uses legal process for a purpose other than that for which it was designed, through an act that is not proper in the regular conduct of the proceeding. See *Scott v. District of Columbia*, 101 A.3d 953, 961 (D.C. 2014); *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).

151. The federal sentencing process exists to provide the court with accurate, reliable information concerning the defendant's conduct so that the court may impose a fair and lawful sentence under 18 U.S.C. § 3553(a). It is not designed to serve as a vehicle for the construction of a predetermined narrative, the presentation of manipulated or nonexistent evidence, or the circumvention of established fact-finding procedures.

152. At all relevant times, Assistant United States Attorney Karen E. Rochlin acted within the scope of her employment as an employee of the United States Department of Justice.

153. Shortly after assuming responsibility for the case — approximately thirty days before sentencing and without ever speaking to Plaintiff — AUSA Rochlin contacted defense counsel, characterized Plaintiff as "a liar," and declared she would seek a sixty-day

custodial sentence. This position was taken before Rochlin had conducted any independent review of the evidentiary record.

154. Rochlin thereafter undertook an independent reconstruction of Plaintiff's digital communications, public statements, social media activity, and private messages outside the scope of the original investigative file and independent of the Presentence Investigation Report process. She then filed a sentencing memorandum on October 28, 2021 that introduced multiple factual representations improper in the regular conduct of sentencing proceedings.

155. These improper acts included, among others:

- Opening the memorandum with a political statement Plaintiff made at approximately 7:00 a.m. on January 6 — roughly eight hours before she entered the Capitol — and presenting it as direct evidence of violent intent tied to her later entry, without any evidentiary link between the two events;
- Citing a recording as evidence that Plaintiff promoted violence "as she arrived at the Capitol," while the memorandum's own footnote placed the recording at 4:22 p.m., more than one hour after Plaintiff had already exited the building, and omitting material language ("someday") that altered its meaning;
- Representing that Plaintiff authored a specific private Gmail communication on January 12, 2021 in which she supposedly stated she would "get off Scott free," although no such communication exists in any forensic extraction, Google Takeout export, device data, or investigative record, and no source document, metadata, or corroborating report has ever been produced;

- ○ Acting in part as an unsworn witness by personally attesting to the existence, timing, and meaning of a Gmail communication that does not exist in any record, without producing any supporting forensic evidence or source material. See *Kalina*, 522 U.S. at 129–31.
- ○ Bypassing the Rule 32 process by sending extra-record "observations" to the Probation Office *(Ex. D)* while later stating on the record that the Government had no objections to the PSR.

156. These acts introduced manipulated, temporally distorted, and nonexistent evidentiary material into the sentencing process. Viewed as a whole, the sentencing memorandum was structured as a deliberate escalation designed to portray Plaintiff as violent, intentional, and unremorseful — a narrative that materially diverged from the plea record and the Probation Office's independent recommendation of probation.

157. The ulterior purpose of these acts was to obtain a custodial sentence that the actual evidentiary record did not support. The United States Probation Office — the neutral judicial officer charged with evaluating Plaintiff's conduct — had recommended probation. The originally assigned prosecutor had not sought incarceration. Without the constructed narrative, the record before the Court consisted only of a single non-violent Class B misdemeanor and a recommendation for a non-custodial sentence.

158. As a direct and proximate result of this abuse of process, Plaintiff was incarcerated for sixty days and suffered loss of liberty, severe emotional distress, reputational harm, financial losses, disruption to her personal and professional life, and continuing injury from the permanent public dissemination of the unsupported sentencing narrative.

159. The sentencing memorandum remains part of the public judicial record on PACER and continues to cause ongoing reputational and professional harm.

160. Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable for the damages resulting from this abuse of process.

**Ulterior Purpose**

161. The Government's actions constitute a classic abuse of process. Rather than using the sentencing proceeding for its proper purpose—to provide the Court with accurate and reliable factual information for an individualized determination under 18 U.S.C. § 3553(a)—AUSA Rochlin used the process to secure a custodial sentence not supported by the evidentiary record.

162. By attributing to Plaintiff a specific Gmail communication that does not exist in any investigative, forensic, or evidentiary record, omitting material contextual evidence including Capitol CCTV footage bearing on the circumstances of entry, and presenting a reconstructed narrative of violent intent and lack of remorse, the Government used the sentencing process to advance a result untethered to the underlying record.

163. The process was thus used not to inform the Court, but to construct and present a materially unsupported factual narrative in order to obtain incarceration that the actual record did not justify. This constitutes a use of legal process for a purpose other than that for which it was designed under District of Columbia law.

**COUNT II – FALSE IMPRISONMENT**
**Federal Tort Claims Act, 28 U.S.C. § 2680(h)**

164. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein, including the investigative and sentencing conduct described in Sections VII.A through VII.I, the Framework of Rochlin's Sentencing Narrative in Section VII.H, and the Waiver of Sovereign Immunity in Section VIII.

165. As a direct and proximate result of the Government's knowing or reckless presentation of manipulated, unsupported, and fabricated evidentiary representations in the sentencing memorandum and at the sentencing hearing, the Court imposed a custodial sentence of sixty days of incarceration on November 4, 2021.

166. Plaintiff was subsequently taken into federal custody, confined in a federal correctional facility, and deprived of her liberty against her will for the full sixty-day term.

167. The Federal Tort Claims Act expressly waives sovereign immunity for false imprisonment committed by investigative or law enforcement officers of the United States acting within the scope of their employment. 28 U.S.C. § 2680(h). AUSA Karen E. Rochlin qualifies under the law enforcement proviso because her conduct involved the review, analysis, and representation of contents from seized digital records and other investigative materials — functions equivalent to executing searches or seizing evidence under Fed. R. Crim. P. 41 and 17(c). See Millbrook v. United States, 569 U.S. 50, 57 (2013) (functional test based on conduct performed, not title).

**Detention**

168. Plaintiff was detained and incarcerated for sixty days pursuant to the custodial sentence imposed by the Court. The detention was involuntary and against Plaintiff's will. Plaintiff served the full term of imprisonment imposed.

**Lack of Lawful Justification**

169. Plaintiff does not challenge AUSA Rochlin's right to advocate for a particular sentence based on the existing evidentiary record. However, the resulting detention lacked lawful justification because the sentencing process was materially corrupted by the presentation of manipulated, suppressed, and fabricated factual representations that had no reliable basis in the underlying investigative record. Specific examples include, but are not limited to:

- Attributing to Plaintiff a private Gmail communication on January 12, 2021, stating she would "get off Scott free," although no such communication exists in any forensic extraction, Google Takeout export, device data, or investigative record, and no source document has ever been produced *(Ex. B; Ex. G);*
- Citing a recording as evidence of violent intent "as she arrived at the Capitol," while the Government's own citation placed the recording at approximately 4:22 p.m. — more than one hour after Plaintiff had already entered and exited the building at ~3:21–3:23 p.m. — and omitting material language that altered its meaning *(Ex. E at 2, 12 n.8);*
- Presenting a morning political statement made approximately eight hours before entry as direct evidence of violent intent tied to the Capitol;
- Characterizing Plaintiff's voluntary exit (captured on video with her statement "I have nothing to do here") as removal by chemical agents;

- Omitting Capitol CCTV footage showing a uniformed officer waving members of the public through the East Rotunda doors immediately before Plaintiff's entry (Ex. I); and
- Mischaracterizing or downplaying Plaintiff's documented cooperation with investigators.

170. These representations formed the core of a constructed narrative urging incarceration despite the United States Probation Office's independent recommendation of probation (Ex. C) and the non-violent, Class B misdemeanor nature of the offense. A deprivation of liberty induced through the presentation of fabricated, materially misleading, or knowingly unsupported factual assertions cannot constitute a lawfully justified restraint. See *Napue v. Illinois*, 360 U.S. 264 (1959); *Townsend v. Burke*, 334 U.S. 736 (1948); *McDonough v. Smith*, 139 S. Ct. 2149 (2019).

171. A deprivation of liberty must rest on information with a reliable evidentiary foundation; fabricated or nonexistent evidence cannot serve as a lawful basis for incarceration.

## Causation

172. A government official may be held responsible for a deprivation of liberty where materially false or unsupported information is introduced into the sentencing process and sets in motion the chain of events resulting in detention. The sentencing court expressly relied on the Government's narrative, citing attributed statements as evidence of violent intent and lack of remorse *(Ex. F at 43:7–11, 47–49)*. Absent those corrupted representations, the record before the Court consisted of a single non-violent

misdemeanor, an approximately ninety-second presence inside the Capitol, and the Probation Office's recommendation of probation. *(Ex. C)*

**Damages & FTCA Waiver**

173. As a direct and proximate result of this false imprisonment, Plaintiff suffered loss of liberty for sixty days, severe emotional distress, reputational harm, financial losses, disruption to her personal and professional life, and continuing injury from the permanent public dissemination of the unsupported sentencing narrative.

174. This conduct does not fall within the discretionary function exception, 28 U.S.C. § 2680(a), because making specific factual representations about the existence, timing, wording, and content of concrete evidence (or the absence of exculpatory evidence) involves no protected policy judgment. See *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988); *Limone v. United States*, 579 F.3d 79 (1st Cir. 2009).

175. Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiff for the damages resulting from this false imprisonment.

**COUNT III – MALICIOUS PROSECUTION**

**Federal Tort Claims Act, 28 U.S.C. § 2680(h)**

176. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein, including the investigative and sentencing conduct described in

Sections VII.A through VII.I, the Framework of Rochlin's Sentencing Narrative in Section VII.H, and the Waiver of Sovereign Immunity in Section VIII.

177. This claim does not arise from the initiation of the misdemeanor charges to which Plaintiff pleaded guilty. It arises from the Government's subsequent continuation and material escalation of the criminal proceeding during the sentencing phase through the knowing or reckless use of fabricated and unsupported factual assertions to procure a custodial sentence.

178. The conduct at issue was investigative in nature — including the post hoc analysis and reconstruction of seized digital records, and the attribution of nonexistent and distorted evidence — and thus falls within the scope of the law enforcement proviso of 28 U.S.C. § 2680(h), rather than protected prosecutorial advocacy.

179. As a direct and proximate result of the Government's presentation of manipulated, unsupported, and fabricated evidentiary representations in the sentencing memorandum and at the sentencing hearing, the Court imposed a custodial sentence of sixty days of incarceration on November 4, 2021.

180. Plaintiff was subsequently taken into federal custody, confined in a federal correctional facility, and deprived of her liberty against her will for the full sixty-day term.

181. The Federal Tort Claims Act expressly waives sovereign immunity for malicious prosecution committed by investigative or law enforcement officers of the United States acting within the scope of their employment. 28 U.S.C. § 2680(h). AUSA Karen E. Rochlin qualifies under the law enforcement proviso because her conduct involved the review, analysis, and representation of contents from seized digital records and other

investigative materials — functions equivalent to executing searches or seizing evidence under Fed. R. Crim. P. 41 and 17(c). See *Millbrook v. United States*, 569 U.S. 50, 57 (2013) (functional test based on conduct performed, not title).

**Continuation of Criminal Proceedings**

182. AUSA Rochlin did not initiate Plaintiff's prosecution but continued and materially escalated the proceeding during the sentencing phase.

183. After assuming responsibility for the case approximately thirty days before sentencing, Rochlin conducted a post hoc reconstruction of digital materials and filed a sentencing memorandum requesting a sixty-day custodial sentence, despite the United States Probation Office's independent recommendation of probation and the absence of any prior request for incarceration by the originally assigned prosecutor. *(Ex. C)*

184. Through this conduct, Rochlin continued the criminal proceeding and expanded its scope by seeking incarceration based on a newly constructed evidentiary narrative that was not supported by the underlying investigative record or the Presentence Investigation Report.

**Absence of Probable Cause**

185. The continuation and escalation of the proceeding lacked probable cause because it relied on factual representations that had no reliable basis in the evidentiary record. Probable cause is absent where a proceeding is materially influenced by false, fabricated, or unsupported evidence. See *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007); *United States v. Lemon*, 723 F.2d 922, 933 (D.C. Cir. 1983); *Chiaverini v. City of Napoleon*, 602 U.S. 1 (2024).

186. While probable cause existed for the original misdemeanor charge, Rochlin's escalation to seek incarceration rested on a newly constructed narrative containing multiple unsupported or fabricated assertions, including the nonexistent "Scott Free" Gmail communication, temporally distorted recordings, and material omissions of exculpatory evidence.

187. These unsupported assertions were central to the request for a custodial sentence. Without them, the record supported only the United States Probation Office's recommendation of probation for a single non-violent Class B misdemeanor.

## Malice

188. AUSA Rochlin acted with malice.

189. Shortly after assuming responsibility for the case — approximately thirty days before sentencing and without ever speaking to Plaintiff — Rochlin contacted defense counsel, characterized Plaintiff as "a liar," and declared she would seek a sixty-day custodial sentence before conducting any independent review of the evidence. She then constructed a sentencing narrative designed to support that predetermined outcome.

190. Malice may be inferred from such recklessness and the use of fabricated or materially unsupported evidence. See *Pitt*, 491 F.3d at 502; *Limone v. United States*, 579 F.3d 79, 89 (1st Cir. 2009).

## Favorable Termination

191. The criminal proceeding terminated in Plaintiff's favor. On January 20, 2025, Plaintiff received a full and unconditional Presidential Pardon, *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.).

192. Under *Thompson v. Clark*, favorable termination requires only that the prosecution end without a conviction. The pardon satisfies this standard. See also *McDonough*, 139 S. Ct. at 2159–60.

**Damages**

193. As a direct and proximate result of this malicious prosecution, Plaintiff was subjected to sixty days of incarceration, suffered severe emotional distress, reputational harm, financial losses (including the loss of her real estate business and professional opportunities), and continues to suffer ongoing injury from the permanent dissemination of the unsupported sentencing narrative in the public judicial record and media reports.

194. Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiff for the damages resulting from this malicious prosecution. These claims are not barred by the discretionary function exception, as the fabrication and misrepresentation of evidence involve no protected policy judgment. See *Berkovitz*, 486 U.S. at 536–38.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)

195. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein, including the investigative and sentencing conduct described in

Sections VII.A through VII.I, the Framework of Rochlin's Sentencing Narrative in Section VII.H, and the Waiver of Sovereign Immunity in Section VIII.

196. Under District of Columbia law, intentional infliction of emotional distress requires extreme and outrageous conduct committed intentionally or with reckless disregard of the probability of causing severe emotional distress, and which in fact causes severe emotional distress. See *Bernstein v. Fernandez*, 649 A.2d 1064, 1071 (D.C. 1994); *Abourezk v. New York Times Co*., 321 A.2d 916, 920 (D.C. 1974).

**Extreme and Outrageous Conduct**

197. After assuming responsibility for the case approximately thirty days before sentencing, AUSA Rochlin deliberately constructed and presented a sentencing narrative that transformed Plaintiff — who had pleaded guilty to a single non-violent Class B misdemeanor involving approximately ninety seconds inside the Capitol — into a calculated, violent, and unrepentant figure deserving of incarceration.

198. Rochlin achieved this portrayal through a series of materially false, fabricated, and selectively presented factual representations, including the attribution of a nonexistent "Scott Free" Gmail communication, the deliberate distortion of timestamps and context of Plaintiff's statements, the omission of exculpatory evidence such as Capitol CCTV footage showing police facilitation of entry, and the mischaracterization of Plaintiff's voluntary exit and extensive cooperation with investigators.

199. The narrative was crafted in a sensationalized, attention-grabbing style with vivid, quotable language that was foreseeably republished by media outlets as established fact By embedding vivid, quotable falsehoods in an official court filing without supporting exhibits or source material, Rochlin ensured that disputed and fabricated factual

representations would be permanently preserved in the judicial record while simultaneously being disseminated worldwide as verified truth. This framing went far beyond legitimate advocacy and functioned as a vehicle for maximum reputational destruction.

200. The extreme and outrageous nature of this conduct is evidenced by the foreseeable and actual public backlash it generated. Media outlets across the country and internationally republished the Government's unsupported assertions as fact, resulting in widespread calls for Plaintiff to receive far harsher punishment — including public demands that she be sentenced to life in prison. This public vilification amplified the harm caused by the false narrative and directly flowed from Rochlin's deliberate construction and dissemination of it.

201. The outrageousness of this conduct is compounded by the power imbalance inherent in a federal prosecution; AUSA Rochlin utilized the immense weight of the United States Government to present as authentic a communication that does not exist in any record, knowing the Plaintiff lacked the institutional resources to immediately disprove it.

202. The attributed message refers to "having a criminal trial" three days before Plaintiff's arrest, at a time when no charges had been filed and no criminal proceeding existed. This temporal inconsistency cannot be reconciled with any authentic communication and reflects that the attributed text does not correspond to any actual message. The use of such a statement to support a custodial sentence lacks a reliable evidentiary basis.

## Intentional or Reckless Conduct

203. AUSA Rochlin acted intentionally or with reckless disregard for the truth of the evidentiary record and the foreseeable severe emotional distress her conduct would cause.

Rather than relying on the actual investigative record or Plaintiff's documented character and conduct, Rochlin substituted her personal opinion that Plaintiff was "a liar" and constructed a sentencing narrative around that preconceived view. She personally reviewed Plaintiff's digital records, personally selected and characterized specific communications and timestamps, and personally attested to the existence of a Gmail message that does not appear in any forensic extraction, Google Takeout export, device data, or investigative file. The alleged message itself contained a clear internal impossibility — it referred to "having a criminal trial" three days before Plaintiff's arrest. These circumstances demonstrate that the false representations were made knowingly or with reckless indifference to the truth of the record, the actual facts of Plaintiff's conduct, and the substantial probability that they would cause severe emotional distress.

## Severe Emotional Distress & Damages

204. As a direct and proximate result of AUSA Rochlin's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including the trauma of sixty days of wrongful incarceration, profound humiliation, anxiety, fear, and lasting psychological injury caused by the public branding of her as a violent and remorseless individual. Plaintiff further suffered permanent reputational harm, the complete destruction of her real estate business and professional livelihood, loss of income and business relationships, and ongoing emotional distress that continues to this day due to the false narrative's enduring presence in the public judicial record and media coverage.

205. Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiff for all damages resulting from this intentional infliction of emotional distress.

## X. DAMAGES

### A. Loss of Liberty

206. As a direct and proximate result of the Government's false and fabricated factual representations, Plaintiff was deprived of her liberty for sixty days. She was sentenced to and served a full term of incarceration in a federal correctional facility under restrictive conditions, with no access to telephone, electronic communication, or institutional programming. This confinement significantly increased the severity and harm of her incarceration.

### B. Reputational Harm

207. The Government's sentencing memorandum falsely attributed to Plaintiff a nonexistent "Scott Free" Gmail communication and constructed a broader narrative portraying her as violent, calculating, and unrepentant. This unsupported filing was placed on the public docket and widely republished by national and international media outlets.

208. These representations were treated as verified fact, resulting in widespread public ridicule, condemnation, and calls for far harsher punishment — including public demands that Plaintiff receive a life sentence. Because the false statements remain part of the permanent judicial record on PACER and continue to appear prominently in online searches of Plaintiff's name, the reputational harm is ongoing and irreparable.

### C. Economic Harm

209. As a direct result of the dissemination of the false narrative and the fabricated "Scott Free" communication, Plaintiff suffered substantial economic losses. For nearly two

decades, she had built a successful career in real estate, life coaching, and public media, all of which depended heavily on her professional reputation and client trust.

210. Following the widespread publication of the sentencing memorandum, Plaintiff lost clients, professional engagements, referral sources, and income-generating opportunities. She was ultimately forced to close her real estate brand and was ostracized within her professional network. The continuing circulation of the false material continues to impair her ability to rebuild her career and generate comparable income.

## D. Emotional Distress

211. Plaintiff suffered severe emotional distress as a direct and proximate result of the Government's conduct. The public dissemination of the false narrative subjected her to widespread ridicule, harassment, hostility, and social isolation. The resulting stigma forced Plaintiff to withdraw from public life and significantly impaired her ability to participate in her community and profession.

212. These events were particularly devastating because they occurred during a period of personal vulnerability, including the death of Plaintiff's mother shortly before sentencing, and were compounded by Plaintiff's documented history of trauma. The false portrayal of her character as violent and remorseless intensified the psychological harm, resulting in anxiety, humiliation, depression, and lasting emotional injury.

## E. Continuing Harm

213. The fabricated "Scott Free" communication and the broader false sentencing narrative remain part of the permanent public judicial record and continue to circulate in media

reports and online searches associated with Plaintiff's name. As a result, all categories of harm described above are ongoing.

214. Prospective clients, business partners, and members of the public routinely encounter this material when searching Plaintiff's name, causing repeated reputational damage, lost opportunities, canceled engagements, diminished income, and continued emotional distress and anxiety.

215. Plaintiff therefore seeks recovery of all compensatory damages available under the Federal Tort Claims Act, including damages for loss of liberty, reputational harm, economic loss, severe emotional distress, and continuing injury.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant United States of America and grant the following relief:

### A. Compensatory Damages (FTCA)

An award of compensatory damages in an amount to be determined at trial, but not less than $10,000,000, for the loss of liberty, reputational injury, economic loss, loss of professional opportunities and relationships, and emotional distress caused by the Government's construction and presentation of a materially false sentencing narrative that resulted in Plaintiff's sixty-day incarceration, stigma, and continuing reputational harm.

### B. Ancillary Equitable Relief Necessary to Remedy the Record

To mitigate the ongoing harm caused by the continued public dissemination of unsupported and fabricated factual assertions, Plaintiff respectfully requests limited equitable relief ancillary to the damages sought, including:

- An Order directing appropriate clarification, annotation, or supplementation of the record in *United States v. Ryan*, No. 1:21-cr-00050-CRC (D.D.C.), to reflect that the alleged "Scott Free Gmail" communication and related factual assertions were not supported by authenticated investigative materials; or
- In the alternative, an Order permitting or directing the filing of a corrected or clarifying statement in the above-captioned criminal case addressing the absence of supporting evidence for those assertions.

**C. Costs**

An award of costs of suit as permitted by law.

**D. Further Relief**

Such other and further relief as the Court deems just and proper.

Respectfully submitted:

Jennifer L. Ryan, *pro se*
6000 Columbus Ave., Ste: 1503
Plano, TX 75024
469-578-0747
jennaryanrealty@gmail.com

Dated: March 25, 2026